NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| METEX MFG. CORPORATION, )<br>)<br>              Plaintiff, )<br>)<br>           -v-         )<br>)<br>IAN MANSON AND MANSON )<br>ENVIRONMENTAL CORPORATION, )<br>)<br>          Defendants. )<br> ) | Hon. Harold A. Ackerman<br><br>Civ. No. 05-cv-2948 (HAA)<br><br>**<u>OPINION & ORDER</u>** |

Jamie P. Clare, Esq.
Cole, Schotz, Meisel, Forman & Leonard, P.A.
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
*Attorneys for Plaintiff*

William W. Robertson
Robertson, Freilich, Bruno & Cohen, LLC
One Riverfront Plaza
Newark, New Jersey 07102
*Attorneys for Defendants*

**<u>ACKERMAN</u>, Senior District Judge:**

      This matter comes before the Court on a motion by Defendants Ian Manson ("Manson") and Manson Environmental Corporation ("MEC") to dismiss for lack of personal jurisdiction the Complaint filed by Plaintiff Metex Manufacturing Corporation ("Metex " or "Plaintiff") (Docket No. 7). Additionally, Plaintiff has filed a motion for leave to file a sur-reply (Docket No. 17). For the reasons discussed below, both motions are DENIED.

*BACKGROUND*

Metex, a New York corporation based in New Jersey, is suing MEC, a Canadian company, and Manson, MEC's president, sole shareholder and principal operating officer, for fraudulent inducement, breach of contract, breach of the covenant of good faith and fair dealing, and replevin.

Metex manufactures, among other things, knitted mesh "substrates" that are used to create small engine catalysts.  If the substrates undergo a manufacturing process whereby they are coated with precious metals, they can be used as mufflers in small engines. By 1998, Metex was interested in expanding its business from automotive parts into the manufacture and supply of small engine parts.  Redem, Inc. ("Redem")[1], a research and development company that coated parts for the automotive industry, introduced Manson to Richard Wojtovitz ("Wojtovitz"), Metex's Senior Sales and Marketing Manager, as an expert in coating metallic and nonmetallic substrates.  At that time, Manson was a principal in the IM Manufacturing Co. ("IM"), an automotive equipment company, in Oakville, Ontario, and assisted Metex on behalf of Redem to provide samples for engine testing for a Wisconsin company called Tecumseh Engine.[2]  However, Tecumsah Engine declined to use Metex as a supplier of catalysts, largely because, at

---

[1] Note that Plaintiff refers to Redem, Inc., an American company doing business in Chicago, while Defendants insist Manson was never employed by Redem, Inc., but rather by Redem Canada, Inc.  Further, Manson says that he was introduced to Metex by Redem Canada, Inc., not by Redem, Inc.

[2] Defendants assert that neither MEC nor Manson was advised as to the identity of the customer for whom the coating was performed.  They claim that while these coated samples requested by Metex may have ultimately been provided to Tecumsah Engine, neither Defendant ever worked directly with that company.

that time, there were no laws requiring small engines to have catalysts.

Then in June 2001, Wojtovitz learned, while on a sales call at Electrolux Home Products ("EHP") that a new Federal law would by 2005 require all hand-held engines in the United States to be equipped with catalysts. Metex, eager to take advantage of the opportunities arising from this new law, contacted Manson again. Manson, also seeking to benefit from this opportunity and acting on behalf of MEC, began to provide technical assistance to Metex, who actively solicited potential customers and gave presentations. Metex asserts that Manson's support helped to convince customers to work with Metex and to confirm that Metex had the skill and ability to produce and test parts in compliance with customer specifications for coated catalysts. Manson eventually agreed to visit customers with Metex and to make technical presentations as a representative of his newly-formed company, MEC.

In October of 2002, Manson traveled to Metex's offices in New Jersey. Manson claims he simply went to tour the facilities as a representative of MEC. On the contrary, Metex maintains that Manson came to solicit Metex's business, solidify his and MEC's relationship with Metex, and plan the necessary course of action for them to jointly obtain large coating contracts and mass-produce coated small engine parts on a long-term basis. In March 2003, Manson signed a non-compete agreement with Metex, providing in part that it would be "construed and interpreted in accordance with the laws of the State of New Jersey."[3] It prevented MEC from designing, soliciting, quoting or selling catalysts of the type that incorporated the knitted wire mesh substrate.

---

[3] The Confidentiality, Intellectual Properties and Non Compete Agreement states: "The Agreement shall be construed and interpreted in accordance with the laws of the State of New Jersey." (Plaintiff's Exhibit B, Exhibits pg. 4 to the Declaration of Paul Messina.)

During May and June of 2004 alone, Manson accompanied Metex's representatives on eight sales calls at different customer's offices in the United States. Throughout those trips, Metex paid in United States dollars for Manson's airfare, lodging and per diem compensation for his services. In May, they traveled to Wisconsin and went to Briggs & Stratton, Tecumsah Engine, Kohler Engine, Harley Davidson and Nelson Industries. In June, they went to Onan Engine, Arctic Cat, and Polaris in Minnesota. Also in June, according to Metex, it ultimately obtained a contract with Engineered Exhaust Systems/B-T, Inc. ("EES"), as a result of Manson's active solicitation of EES's business.[4] The contract called for Metex to deliver 1 million coated catalysts from New Jersey. Although Manson alleges that he "came to understand" that EES was a Metex customer, Metex maintains that Manson portrayed himself as an expert parts coater, provided documents to Metex to include in its written presentation to EES, visited EES with Metex's representatives, and invited EES's principals to his facility in Canada in order to observe his production facilities first-hand.

Moreover, Metex claims that Manson purchased more than $125,000 worth of coating equipment for MEC to perform under its contract with Metex. Further, Metex asserts that Metex's representatives traveled to Canada to help Manson assemble and install it. During July and August of 2004, Metex and Manson corresponded frequently by phone and email to arrange various individual purchase orders, each for more than 1 million parts, hundreds of thousands of

---

[4] Defendants argue that while Manson had a general understanding that EES was a potential customer for the coated catalysts and visited EES with Metex, he was unaware of the details of the relationship between Metex and EES. However, Defendants admit that Metex did arrange for EES to visit the MEC facility in Canada. Additionally, Defendants claim that Manson believed the products MEC produced were going to EHP, and was unaware that EES was the customer.

which were to be manufactured by MEC and delivered to Metex in New Jersey. Beginning in December of 2004, MEC began shipping coated catalysts to Metex pursuant to the aforementioned purchase orders. Over the next 3 months, MEC shipped more than 575,000 coated catalysts to Metex pursuant to the purchase orders. As per their contract, Manson personally verified that the parts MEC produced and shipped to Metex met Metex's and EES's specifications.

In February of 2005, Metex discovered through independent laboratory testing that MEC's coating of its wire mesh substrates was not to specification. Metex notified MEC and Manson immediately, and demanded corrective action. Representatives of Metex traveled to MEC's facility in Canada and met with Manson on various occasions in attempts to help Manson uncover the problem and create a solution. During this time, EES demanded that corrective action be taken so to avoid the shut-down of its manufacturing facility in China and its customer EHP's facility in Arkansas. EES informed Metex that its catalysts failed EHP's engine performance tests. Additionally, four independent laboratories employed by Metex reported test results showing that the majority of MEC's parts failed to meet EES or Metex specifications.

Manson was unable to explain the discrepancy between his own tests for specification and the independent laboratory tests. However, Manson admitted that the parts shipped were not coated to specification, as a result of improper testing, and that MEC was unable to coat them to specification. On March 21, 2005, MEC issued the 7-step Corrective Action Plan ("Corrective Action Plan"), which was signed by Manson and sent to Metex. Specifically, the Corrective Action Plan admits that "[a]nalyses of parts from the first three production lots were found to contain insufficient quantities of Platinum Group Metals (PGM) Platinum, Palladium and

5

Rhodium," and that "MEC deviated from the analytical process for the sake of expediency. Rather than use the Atomic Absorption equipment which was not correctly operational, a combination of absolute weight gain and x-ray analysis using scanning electron microscope was implemented."[5]  Despite issuing the Corrective Action Plan, MEC halted further production of catalysts and demanded payment for all of the catalysts that it coated and recoated upon return, notwithstanding whether the catalysts met Metex's specifications.

      Metex filed suit against Manson and MEC, alleging that Manson lied about his abilities as a coater and fraudulently induced Metex to enter into a contract with MEC, and that MEC breached their contract.  Metex claims that Manson personally assured Metex that he and MEC were capable of producing parts to specification, when in fact, they did not have the ability or the resources to do so.  Metex also claims that Manson misrepresented that he and MEC would perform certain tests on the coated catalysts before shipping them to Metex in New Jersey, when in fact, neither he nor MEC intended to perform or actually performed those tests.

      As a result of MEC's and Manson's misrepresentation and breach of contract, Metex claims that it has incurred losses for nonconforming goods, parts that needed to be thrown away, consulting fees, travel, laboratory testing, and legal expenses currently exceeding $445,000. Moreover, MEC lost the business of EES, who decided to contract with an alternate vendor of coated catalysts.  Further, EES has demanded payment from Metex of more than $461,262 for shipping and loss of the mufflers it manufactured using the faulty catalysts.

      Defendants Manson and MEC moved to dismiss the complaint in lieu of an answer.  They

---

[5] Corrective Action Plan - Exhibit C to Brief of Plaintiff, Metex Mfg. Corporation, in Opposition to Defendants' Rule 12(b)(2) Motion to Dismiss for Lack of Personal Jurisdiction.

assert a lack of personal jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(2). They insist that all of the relevant discussions, negotiations, processing, manufacturing, and testing occurred in Canada, and that the defendants and the crucial evidence for the case are located in Canada. Moreover, the alleged breach of contract and fraudulent inducement took place in Canada, and the materials related to the replevin claim are in Canada. Manson is the founder and sole shareholder of MEC. MEC employs just four individuals, has its principal place of business and a manufacturing facility in Ontario, Canada, does not have any offices, facilities or property outside of Canada, and only pays taxes to the Canadian government. MEC is not licensed to do business in New Jersey, does not have offices, bank accounts or financial assets, a postal mailing address, or telephone and fax numbers there or anywhere else in the United States. MEC does not have an internet website, and it does not advertise in or purchase supplies from New Jersey. MEC also claims that Metex is its only United States customer. Therefore, Manson and MEC claim that the exercise of jurisdiction over them by this Court would not only offend the Due Process Clause of the United States Constitution, but also any common sense notions of fair play and substantial justice.

### *ANALYSIS*

**I.     Defendants' Motion to Dismiss Fails As Metex Has Stated Sufficient Facts to Support An Exercise of Specific Jurisdiction Over Defendants**

Federal Rule of Civil Procedure 12(b)(2) permits a court to dismiss a complaint, or a count therein, for lack of personal jurisdiction. When a defendant raises a possible lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that jurisdiction exists and of "present[ing] a prima facie case for the exercise of personal jurisdiction by establishing with

reasonable particularity sufficient contacts between the defendant and the forum state." *Malaysia Int'l Shipping Corp. v. Sinochem Int'l Co.*, 436, F. 3d 349, 364 (3d Cir. 2006) (quoting *Mellon Bank (E.) PSFS, Nat'l Ass'n v. Farino*, 960 F. 2d 1217, 1223 (3d Cir. 1992)) (internal quotation marks omitted).  The plaintiff should demonstrate that there is a "nexus between the defendant, the forum and the litigation" to establish *in personam* jurisdiction.  *General Elec. Co. v. Deutz AG*, 270 F.3d 144, 149 (3d Cir. 2001).  The plaintiff may show either general or specific personal jurisdiction.  *Id.*  Here, while New Jersey does not have general jurisdiction over Defendants, the State may exercise specific jurisdiction over them.

## A.     General Jurisdiction Not Applicable To Defendants

Defendants are not subject to general jurisdiction in New Jersey.  General jurisdiction exists when the defendant's contacts with the forum are "continuous and systematic," even where the connection between the defendant's contacts and the litigation are insufficient to amount to specific jurisdiction.  *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 317 (1945); *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 416 (1984).  The contacts between the defendant and the forum do not have to be "specifically related to the underlying cause of action" for the exercise of personal jurisdiction to be legitimate.  *Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002).

In *BP Chemicals*, the Third Circuit found that although the defendant exported its products to the United States, it had no personnel or facilities in the forum state, nor did it advertise or solicit business there.  *BP Chemicals Ltd. v. Formosa Chemical & Fibre Corp.*, 229 F.3d 254, 262 (3d Cir. 2000) (quoting *Burger King*, 471 U.S. at 475).  Thus, the Court was unable to conclude that the company had a continuous presence in the United States.  *Id.*

Likewise, MEC exports products to New Jersey, but it is undisputed that it has no personnel or facilities here and has not advertised here. Although MEC has not directly solicited its own business here in the United States, Manson, on behalf of MEC, has helped Metex to obtain additional customers by providing technical support to Metex during sales presentations. Nevertheless, this court does not find that Manson's visits to the United States, which occurred over the space of a few months, are sufficient to establish general jurisdiction over either Manson or MEC in New Jersey. In their briefs in support of the motion to dismiss, Defendants have successfully argued in opposition to general jurisdiction; however, as discussed below, Defendants are unable to muster a successful opposition to this Court's exercise of specific jurisdiction over Metex and MEC.

  **B.**  **Specific Jurisdiction Standard**

  Specific jurisdiction exists over a defendant when that defendant has "purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that arise out of or relate to those activities." *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 96 (3d Cir. 2004) (quoting *Burger King Corp v. Rudzewicz*, 471 U.S. 462, 472 (1985)) (internal quotations and citation omitted). The Due Process Clause of the Fifth Amendment mandates that for specific jurisdiction the defendant must first have "constitutionally sufficient 'minimum contacts' with the forum." *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 451 (3d Cir. 2003) (quoting *Burger King*, 471 U.S. at 474).

  "Minimum contacts" signifies "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Toys "R" Us*, 318 F.3d at 451(quoting *Asahi Metal Indus. Co., Ltd. v.*

*Superior Court of California*, 480 U.S. 102, 109 (1987)).  The requirement of purposeful availment guarantees that the defendant will not be subject to jurisdiction only because of "'random,' 'fortuitous,'or 'attenuated' contacts. . . ."  *BP Chemicals*, 229 F.3d at 259 (quoting *Burger King*, 471 U.S. at 475).  The Supreme Court has held that a nonresident defendant who "purposefully directs" his activities at forum residents may legitimately be subject to jurisdiction in that forum.  *BP Chemicals*, 229 F.3d at 259 (quoting *Burger King*, 471 U.S. at 475).

According to Federal Rules of Civil Procedure, a federal court sitting in New Jersey has jurisdiction over parties to the extent provided under New Jersey state law.  *Miller Yacht Sales*, 384 F.3d at 96 (3d Cir. 2004).  *See* Fed.R.Civ.P. 4(e); *See also Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 150 (3d Cir. 1992).  New Jersey's long-arm statute provides for jurisdiction coextensive with the due process requirements of the United States Constitution.  *Miller Yacht Sales*, 384 F.3d at 96; *See* N.J. Court Rule 4:4-4(c);  *See also Charles Gendler & Co, v. Telecom Equip. Corp.*, 102 N.J. 460, 508 (1986).  Thus, parties who have constitutionally sufficient "minimum contacts" within New Jersey are subject to suit here.  *Miller Yacht Sale*s, 384 F.3d at 96; *See Carteret Sav. Bank*, 954 F.2d at 149.

Additionally, subjecting the defendant to a particular court's jurisdiction must comport with "traditional notions of fair play and substantial justice."  *Toys "R" Us*, 318 F.3d at 451 (quoting *Int'l Shoe*, 326 U.S. at 316).  It will generally not be unfair to subject a defendant to the burdens of litigating in another state for disputes relating to his interstate activities, since "modern transportation and communications have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity."  *BP Chemicals*, 229 F.3d at 260 (quoting *Burger King*, 471 U.S. at 474).  Moreover, "[a] State generally has a 'manifest

interest' in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors." *BP Chemicals*, 229 F.3d at 260 (quoting *Burger King*, 471 U.S. at 473). New Jersey has an interest in protecting its residents and corporations from the injuries inflicted by out-of-state and foreign actors, and in preventing breaches of contract from affecting its economy and commercial operations. Additionally, it would be unjust to allow actors to "purposefully derive benefit" from their interstate activities, but to not hold them accountable for consequences arising out of those activities in other states. *BP Chemicals*, 229 F.3d at 260 (quoting *Burger King*, 471 U.S. at 473-4).

  **C. By Their Actions, Defendants Have Established the Requisite Minimum Contacts To Subject Them to Specific Jurisdiction in this Forum**

  In this case, Metex has asserted that Manson and MEC engaged in specific conduct and correspondence with Metex in regard to Metex's New Jersey business, such that Defendants are subject to the jurisdiction of this court. Manson and MEC have purposefully conducted business with Metex, a company operating in New Jersey. They have thereby engaged in the requisite minimum contacts to constitute purposeful availment of the privilege of conducting activities within the forum State, which justifies this Court's exercise of personal jurisdiction over them.

  According to *Burger King*, in which the Supreme Court held that the district court's exercise of personal jurisdiction pursuant to Florida's long-arm statute did not violate the Due Process Clause of the Fourteenth Amendment, a single contact that creates a substantial connection with the forum may be sufficient to support the exercise of personal jurisdiction over a defendant. *Burger King*, 471 U.S. at 475. Since the defendants were Michigan residents who operated a franchise within Michigan and the franchiser-plaintiff was a Florida corporation with

11

its principal offices in Miami, the defendants argued that the Southern District of Florida lacked jurisdiction over them. *Id.* at 464, 66. In finding that the franchisee-defendants were subject to suit in Florida, the Supreme Court held it was not solely the existence of the contract between the parties that established minimum contacts and therefore personal jurisdiction over the defendant, but rather jurisdiction rested on the existence of the contract combined with the "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *Id.* at 479. The appellee, an "experienced and sophisticated" businessman, formed a long-term relationship and "substantial connection" with Burger King's Miami headquarters, was familiar with its policies, and had notice from the governing contracts that the franchise relationship was established in Miami and governed by Florida law. *Id.* at 479, 484. The Supreme Court found there to be personal jurisdiction and emphasized that jurisdiction would not be found lacking merely because the defendant was not physically present in the forum, especially considering the modern nature of commercial transactions. *Id.* at 476.

In contrast, in *BP Chemicals*, the Third Circuit held that the non-resident's communications with a forum resident for the purpose of establishing a contract and furthering the contractual relationship were insufficient to establish the minimum contacts required for specific jurisdiction. *BP Chemicals*, 229 F.3d at 261. The contracts in question were for a solitary purchase of equipment on only one occasion, and that equipment was to be shipped to Taiwan. *Id.* Moreover, the contracts were solicited and negotiated through Taiwanese agents. *Id.* Additionally, the arbitration clause provision in the contract did not specify the law of any particular American jurisdiction that would govern potential disputes, but merely stipulated

venue selection. *Id.* at 262. Thus, the Court found that the forum lacked specific jurisdiction over the defendant.

The Third Circuit has instructed in *General Electric* that when reviewing contract cases for jurisdiction, a court should consider "whether the defendant's contacts with the forum were instrumental in either the formation of the contract or its breach." *General Elec. Co.*, 270 F.3d 144, 150 (3d Cir. 2001). In *General Electric*, the plaintiff, a New York corporation with manufacturing facilities in Pennsylvania, entered into a contract with a German corporation, whose parent company and guarantor was the defendant in this case. *Id.* at 149. When the defendant failed to provide the additional funding requested by the plaintiff, as per the contract, the plaintiff brought suit in federal court in Pennsylvania. *Id.* The Third Circuit affirmed the District Court's ruling that the defendant's contacts with Pennsylvania, "in the course of pre-contract negotiations and post-contract visits . . . in an effort to resolve the parties' dispute," sufficed to constitute specific jurisdiction. *Id.* The defendant had maintained extensive correspondence and physical contacts with the forum of Pennsylvania, including visiting the plaintiff's Pennsylvania facilities. Notably, at the Pennsylvania site, the parties engaged in discussions regarding the development of their joint business ventures, of which the defendant's role as guarantor was an essential element. *Id.* at 152. Thus, the Court found that the defendant's behavior amounted to "'purposeful direction' of business activity" toward the plaintiff, and that the suit "arose out of [defendant's] contractual endeavors." *Id.*

Moreover, the Third Circuit has said that it is not significant in determining specific jurisdiction to focus on which party initiated the relationship. *Carteret Sav. Bank,* 954 F.2d at 150. In *Carteret Savings Bank*, the Court disregarded whether the plaintiff invited the out-of-

state defendant to its New Jersey meeting or whether the defendant himself initiated the meeting. *Id.* Instead, the Court determined that telephone calls and letters to New Jersey, in addition to the defendant's attendance at one meeting with the Plaintiff in New Jersey pertaining to an important transaction, constituted minimum contacts sufficient to establish personal jurisdiction. *Id.*

Here, neither the existence of a non-compete agreement between the Defendants and Plaintiff nor the contract's choice-of-law clause, which states that the agreement will be "construed and interpreted in accordance with the laws of the State of New Jersey," is sufficient on its own to create a substantial connection that establishes specific jurisdiction. *Burger King Corp,* 471 U.S. at 478, 481. However, *Burger King* does suggest that those two factors, combined with the existence of an ongoing interdependent relationship between the parties, here evidenced by the continuous correspondence, Manson's visit to Metex's New Jersey facilities, and Manson's willingness to accompany Metex at sales presentations throughout the United States on behalf of MEC, would constitute purposeful availment.

Defendants' contacts with Metex in New Jersey were integral both in the formation of their contract and the breach of contract. Plaintiff and Defendants have been in contact since 1998. Defendants have provided technical assistance to Plaintiff since 2001. Defendants have shipped parts to Plaintiff in New Jersey. Further, they essentially operated as a sales and manufacturing team throughout the United States during the last several years. Manson's October 2002 visit to New Jersey solidified his and his company MEC's relationship with Metex, and it set the stage for their joint long-term contracts with other companies requiring coated substrates. Defendants convinced Plaintiff that MEC could properly coat its mesh substrates to meet Metex's and its customers' specifications. Once the parties agreed upon specifications,

amounts and prices, Defendants improperly coated the substrates and shipped those defective products to New Jersey. Although Manson insists that he was a passive participant and that Metex actively sought out his and MEC's business, identifying which party initiated the relationship has no bearing on the question of personal jurisdiction. *Carteret Sav. Bank,* 954 F.2d at 150. In sum, Defendants established the requisite minimum contacts to be subject to specific jurisdiction.

      **D.**      **The Exercise Of Jurisdiction Comports With Traditional Notions of Fair Play and Substantial Justice**

Once it is clear that a defendant has established the requisite minimum contacts, it is necessary to determine whether the exercise of jurisdiction "comports with traditional notions of fair play and substantial justice." *Toys "R" Us*, 318 F.3d at 451(quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). If the exercise of jurisdiction does comport with those "traditional notions," then the defendant "should reasonably anticipate being haled into court" in that forum. *Toys "R" Us*, 318 F.3d at 451(quoting *World-Wide Volkswagen*, 444 U.S. at 297). In order to successfully challenge jurisdiction pursuant to a fairness analysis, a defendant must "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Miller Yacht Sales*, 384 F.3d at 97 (quoting *Burger King*, 471 U.S. at 477). A court may consider various factors when determining fairness in this context, including: the forum State's interest in adjudicating the dispute; the shared interest of the several States in furthering fundamental substantive social policies; the burden on the defendant; and the plaintiff's interest in obtaining the most efficient resolution of controversies. *Miller Yacht Sales*, 384 F.3d at 97 (quoting *Burger King*, 471 U.S. at 477).

The Third Circuit determined in *Mesalic v. Fiberfloat Corp.* that Fiberfloat, a Florida resident, would not be unduly burdened by the expenses of litigating in New Jersey. *Carteret Sav. Bank,* 954 F.2d at 151; *Mesalic v. Fiberfloat Corp.*, 897 F. 2d 696 (3d Cir. 1990). It held that New Jersey had a "valid interest in protecting its residents from damages arising out of the sale by a nonresident of a defectively manufactured product." *Carteret Sav. Bank,* 954 F.2d at 151; *Mesalic*, 897 F. 2d at 701. Likewise, here, New Jersey has a valid interest in protecting Metex from losses suffered as a result of MEC's defectively manufactured product and Manson's fraudulent inducement.

New Jersey has a very strong interest in ensuring that contracts entered into under its laws are not breached or fraudulently induced. Manson and MEC profited from MEC's commercial activity in the United States, as a result of its relationship with this New Jersey corporation, and they should not be allowed to break the laws of the several states, particularly New Jersey's, with impunity. Further, the several States, including those other States with companies affected by the Defendants' defectively-coated products, have a common interest in preventing foreign companies doing business in the United States from failing to perform on their contracts.

Based on the length and persistence of their contact and on the closeness of their business relationship with Metex, as well as on the selection of New Jersey law for the resolution of issues related to their non-compete agreement, Manson and MEC should have been cognizant that they may be haled into court in New Jersey. Moreover, any claimed burden on the Defendants is not so heavy as to outweigh the other factors. Although MEC is a Canadian corporation and Manson is a Canadian citizen, they had no difficulty engaging in economic activity in the United States and visiting New Jersey. They have already shown that travel to

16

New Jersey and other States in the United States is not only convenient for them, but is simply part of their ongoing business enterprise. Further, their lawyers would be able to take advantage of modern conveniences to diminish any potential inconvenience.

Finally, conducting the litigation in federal court in New Jersey is obviously the most convenient and efficient method for Plaintiff, whose business operates in the State. It will not have to transport witnesses and documents to another location. Therefore, Defendants' contacts with New Jersey are sufficient to subject both Manson and MEC to personal jurisdiction in the State, without offending traditional notions of fair play and substantial justice.

## II.     Plaintiff's Motion for Leave to File a Sur-Reply Is Denied

On October 24, 2005, Plaintiff requested leave to file the Declaration of Gregory Vongas as part of a sur-reply to Defendants' motion to dismiss for lack of personal jurisdiction. Defendants oppose the motion on grounds that Plaintiff merely seeks to re-assert its version of the facts in opposition to their motion to dismiss, and that New Jersey Local Rules of Federal Procedure do not permit such a filing when Plaintiff already had its opportunity to provide full disclosure and to preserve the record in its opposition.

"It is axiomatic that Reply Briefs should respond to the respondent's arguments or explain a position in the initial brief that the respondent has refuted. The rationale for this rule is self-evident - because the local rules do not permit sur-Reply Briefs, *see* L.Civ.R. 7.1(d), a party opposing [a motion] has no opportunity to respond to newly-minted arguments contained in Reply Briefs." *CIBC World Markets, Inc. v. Deutsche Bank Securities*, 309 F. Supp.2d 637, 645 (D.N.J. 2004) (quoting *Bayer AG v. Schein Pharmaceutical, Inc.*, 129 F. Supp.2d 705, 716 (D.N.J. 2001)) (internal quotations omitted). In *Venuto v. Carella*, the Third Circuit recognized

17

the plaintiff's adversarial tactic of filing a sur-reply to be "sandbagging." *Venuto v. Carella*, 11 F. 32 385, 388 (3d Cir. 1993). After the defendants filed their reply brief, the plaintiff filed a sur-reply, a five-page memorandum reasserting the same arguments that the plaintiff presented on appeal. *Id.* The Court said that the district court acted within its discretion when it did not consider the sur-reply, that it was proper not to consider it, and that issues not raised in the district court are waived upon a appeal. *Id.*

Because Plaintiff has demonstrated no extraordinary circumstances justifying the proposed sur-reply, and because Plaintiff already had an opportunity in its opposition brief to provide full disclosure and to preserve the record, Plaintiff's request for leave to file a sur-reply is DENIED.

### *Conclusion*

For the foregoing reasons, it is hereby ORDERED on this 4th day of August 2006 that Defendants' motion to dismiss the Complaint is DENIED. Additionally, Plaintiff's motion for leave to file a sur-reply is DENIED.

Newark, New Jersey                                                                              s/ Harold A. Ackerman, U.S.D.J.
Dated: August 4, 2006