UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

**NOT FOR PUBLICATION**

| | |
|---|---|
| METEX MANUFACTURING CORP. | Civil Action No.: 05-2948 (HAA) |
| Plaintiff, | OPINION AND ORDER ON FORMAL MOTION |
| v. | |
| MANSON ENVIRONMENTAL CORP. et al., | |
| Defendants. | |

**SALAS, UNITED STATES MAGISTRATE JUDGE**

This matter having been opened to the Court by motion by Jamie P. Clare, of the law offices of Cole, Schotz, Meizel, Forman & Leonard, P.A., attorneys for Plaintiff Metex Manufacturing Corporation ("Plaintiff" or "Metex") seeking leave to file an Amended Complaint (Dkt. # 38) pursuant to FED.R.CIV.P. 15(a); and considering Defendants Manson Environmental Corporation's ("MEC") and Ian Manson's (collectively "Defendants") opposition; and the Court considering this motion pursuant to FED.R.CIV.P. 78; and for the reasons set forth below, the motion is hereby **DENIED**.

**I. BACKGROUND**

The issue in this case is a failed business deal between Metex and MEC. In the summer of 2004, Metex a New York corporation with its principal place of business in Edison, New Jersey, issued several purchase orders to MEC, a Canadian corporation, for coated wire mesh

substrates.  [Proposed Amend. Comp. ¶¶ 1, 8-10].  Shortly after receiving the goods, Metex noticed that MEC was not coating the wire mesh substrates according to specifications, and so it employed independent laboratories to test MEC's wire mesh substrates.  The testing confirmed that MEC's products failed to meet the specifications of the agreement.  [*Id*. ¶ 15].  In March 2005, MEC issued a 7-Step Corrective Action Plan in which it admitted that it was unable to coat Metex's wire mesh substrates according to specification.  [*Id*. ¶¶ 22-24].  Thereafter, Metex returned 105,729 wire mesh catalysts to be recoated.  [*Id*. ¶ 25].  MEC then halted production and demanded payment for all catalysts regardless of whether they met specifications and refused to return Metex's catalysts.  [*Id*. ¶ 27].  Metex's now alleges fraudulent inducement, breach of contract, breach of the covenant of good faith and fair dealing, and replevin.

The event that caused the filing of the instant motion, is the alleged fraudulent transfer of MEC real property to a Canadian entity named Manson Properties Corporation ("Manson Properties").  At the April 18, 2007 deposition of MEC's president Ian Manson ("Manson") Plaintiff learned that in 2005, MEC had transferred a building owned and operated by MEC to Manson Properties.  [Ex. B. To Clare Cert., Manson Dep. Trans. ("Manson Dep.") 33].  Manson Properties is owned in whole by Manson's wife, Alicia Manson.  [Alicia Manson Cert. ¶¶ 1-2].  Metex claims that this transfer was fraudulent because Defendants made the transfer "at a time when they know or should have known Metex was threatening or about to begin litigation against them," and therefore the transfer was to avoid creditors and was made without MEC receiving a reasonably equivalent value in exchange.  [Pl. Br. 1, 7-8].

Defendants allege that the transfer of property from MEC to Manson Properties was not transferred fraudulently and was contemplated long before Metex and MEC began business

relations.  In June 2000, MEC and a Canadian corporation named Redem Canada ("Redem") entered into a relationship whereby Redem invested money into MEC in exchange for MEC performing research and development, fabricating manufacturing equipment and conducting coating work for Redem.  [Manson Cert. ¶¶ 2-3].  MEC purchased equipment with some of Redem's investment monies.  [*Id*. ¶ 2].  In December 2002, Redem ceased operations and terminated its lease of MEC's building.  [*Id*. ¶ 4].  A few months later, Redem forgave MEC's indebtedness to Redem and took the equipment from MEC that MEC had purchased with Redem's investment money.  [*Id*. ¶ 4-5]

Some time later, MEC learned that there was animosity between the investors/ shareholders of Redem and the CEO of Redem.  [*Id*. ¶ 8].  MEC was concerned that this rift may lead some investors/shareholders to question Redem's forgiveness of MEC's debt.  [*Id*.].  Thus, MEC decided that it would transfer the building to a separate corporation (Manson Properties) to protect it from any potential claims from Redem.  [Manson Dep. 33:11-14].  The decision to transfer the building occurred sometime in 2003.  [Manson Cert. ¶ 14].

The actual transfer of the building from MEC to Manson Properties occurred in March 2005, and according to Defendants, it was conducted with the advice of both an accountant and counsel.  [Def. Opp. 7, Manson Cert. ¶ 8].  MEC argues that the transfer was conducted legally pursuant to Canadian law.  [Manson Cert. ¶ 10].  In return for the transfer, MEC received 3,551 redeemable, retractable, class A preference shares of stock in Manson Properties that had a value of $355,127, which were later redeemed.  [*Id*. ¶ 9].  Manson Properties took control of the property and assumed the mortgage.  [*Id*.].  MEC continues to use the building and pays rent to Manson Properties.  [*Id*. ¶ 11].

Defendants argue that the transfer of the building was done for a couple of reasons. First, it was done for "tax planning purposes to facilitate the splitting of income between Mr. Manson and his wife" and to allow "any future sale of MEC to be conducted independently of the sale of the real estate." [Def. Opp. 6]. Additionally, the Defendants argue that the transfer was contemplated before Metex and MEC entered into business relations and the actual transfer occurred before there was any threat of the present litigation. [*Id*. 6-7].

Metex now seeks to file an amended complaint to bring a claim against the Defendants and Manson Properties for fraudulent transfer of assets pursuant to the New Jersey Fraudulent Transfer Act, N.J.S.A. 25:2-25 *et seq* ("NJFTA"). Specifically, Plaintiff's proposed Amended Complaint seeks an entry of judgement setting aside the fraudulent transfer and awarding Plaintiff compensatory, consequential, incidental and punitive damages.

## II. DISCUSSION

The amendment of pleadings is governed by FED.R.CIV.P. 15 which states "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." FED.R.CIV.P. 15(a)(2). Although leave to amend the pleadings under FED.R.CIV.P. 15(a) is generally given freely, a court may deny a motion to amend where there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of the amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962). In determining whether to allow a motion to amend a complaint a court looks only at the pleadings. *Pharmaceutical Sales and Consulting Corp. v. J.W.S. Delavau, Co., Inc.*, 106 F.Supp. 2d 761, 765 (D.N.J. 2000).

Defendants present four arguments in opposition to Plaintiff's motion to amend: (1) Amending the complaint would cause undue prejudice to Defendants; (2) Plaintiff's claim against Manson Properties is futile as this Court does not have personal jurisdiction over Manson Properties; (3) Plaintiff's claims under the NJFTA are futile as New Jersey law does not apply to the transfer of the property; and (4) Assuming the NJFTA does apply to the transfer, the claims are futile as the transfer of property was not fraudulent.  The Court will discuss each argument in turn.

### A.    Undue Prejudice

"[P]rejudice to the non-moving party is the touchstone for the denial of an amendment." *Cornell & Co. v. Occupational Safety & Health Review Comm'n*, 573 F.2d 820, 823 (3d Cir. 1978).  "Prejudice under [R. 15(a)] means undue difficulty in prosecuting a lawsuit as a result of a change of tactics or theories on the part of the other party." *Deakyne v. Commissioners of Lewes*, 416 F.2d 290, 300 (3d Cir. 1969).  Prejudice involves the serious impairment of the defendant's ability to present its case. *Harter v. GAF Corp.*, 150 F.R.D. 502, 509 (D.N.J. 1993). A motion to amend a complaint may be properly denied as unduly prejudicial to the non-moving party when it is made on the eve of trial or after the close of discovery. *See e.g., Gay v. Petsock*, 917 F.2d 768, 772 (3d Cir. 1990) (denying motion to add additional claims made on first day of trial); *Berger v. Edgewater Steel Co.*, 911 F.2d 911, 923-24 (3d Cir. 1990) (denying motion to add additional claims made four months after new information became available and two months after close of extended discovery).

Defendants argue that they will be unduly prejudiced by Plaintiff's amended complaint because the Plaintiff waited three months after finding out about the potential new claims to file

the instant motion. [Def. Opp. 28]. Defendants argue that Plaintiff learned about the potential new claims during the April 2007 deposition of Manson but waited until July 2007 to file this motion. [*Id*.]. Also, Defendants argue that permitting this amendment would force the Defendants to engage in costly and time consuming discovery on frivolous claims. [*Id*.]. Plaintiff argues in its moving papers that Defendants would not be unduly prejudiced because the amended complaint is merely conforming to the evidence learned at Manson's deposition. [Pl. Br. 4].

      The Court does not find that Plaintiff's proposed amended complaint would cause any undue prejudice to the Defendants. The mere fact that the Defendants believe that these claims are frivolous is not a ground for finding undue prejudice. The liberal pleadings standard employed by the Federal Rules of Civil Procedure encourages parties to seek amendments to facilitate the efficient administration of justice. Also, the Court does not find that Plaintiff unduly delayed in bringing the motion. Plaintiff brought the motion a mere three months after learning about the new information. A litigant should not be forced to engage in action the minute after he or she learns of new evidence. To do so would force parties to engage in potentially unnecessary motion practice and would be a waste of judicial time and resources. Thus, the Court does not find that the Plaintiff's amended complaint would cause any undue prejudice nor did they unduly delay in bringing the motion.

      In light of the fact that the parties did not address bad faith or dilatory motive, the Court will not conduct an analysis under either factor and instead will find that no bad faith or dilatory motive exists on the part of the Plaintiff.

### B. Futility

A claim of "[f]utility is shown when the claim or defense is not accompanied by a showing of plausibility sufficient to present a triable issue." *Harrison Beverage Co. v. Dribeck Importers, Inc.*, 133 F.R.D. 463, 468 (D.N.J. 1990). "A determination as to futility does not require a conclusive determination on the merits of a claim or defense; rather, the futility of an amendment may only serve as a basis for denial of leave to amend when the proposed amendment is frivolous or advances a claim that is legally insufficient on its face." *Pharmaceutical Sales and Consulting Corp. v. J.W.S. Delavau Co., Inc.*, 106 F.Supp.2d 761, 764 (D.N.J. 2000). In determining whether an amendment is "insufficient on its face," the Court employs the Rule 12(b)(6) motion to dismiss standard. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997) (citations omitted). The question before the Court, therefore, is not whether the movant will ultimately prevail; rather, it is whether the movant can prove any set of facts in support of the asserted claims that would entitle the movant to relief. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984). The court must accept the allegations in the pleadings as true and construe the allegations in a light most favorable to the Plaintiff. *Marks v. Strubble*, 347 F.Supp.2d 146, 150 (D.N.J. 2004). "Moreover, given the liberal standard applied to the amendment of pleadings, courts place a heavy burden on opponents who wish to declare the proposed amendment futile." *Pharmaceutical Sales and Consulting Corp.,* 106 F.Supp.2d at 764.

### 1. Personal Jurisdiction

Defendants claim that Plaintiff's amended complaint is futile because the Court does not have personal jurisdiction over Manson Properties. Defendants assert that this Court lacks

jurisdiction because Manson Properties is "a Canadian corporation with no contacts to the United States." [Def. Opp. 14]. In support of this claim, Defendants have offered a certification of Alicia Manson whereby she certifies Manson Properties does not conduct any business in the United States or New Jersey, does not advertise in the United States or New Jersey and does not have any contacts with the United States or New Jersey. [Alicia Manson Cert. ¶¶ 2-5]. Plaintiff replies by stating that Manson Properties is an alter ego of MEC and therefore the contacts of MEC are imputed to Manson Properties, thus establishing personal jurisdiction over Manson Properties. [Pl. Reply. Br. 5]. Other then the certification of Alicia Manson, neither party has produced any other evidence in support of or against personal jurisdiction.

At this time, the Court declines to rule on the issue of personal jurisdiction. The Court finds that the issue is premature because the parties have not submitted affidavits or other jurisdictional evidence. While the Defendants have offered Alicia Manson's certification as evidence that New Jersey lacks the necessary contacts to establish personal jurisdiction over Manson Properties, the Court finds that this evidence is insufficient to determine the issue of personal jurisdiction at this time. Without further proofs, the Court will not endeavor to conduct a full analysis of this issue and instead will presume it has jurisdiction over Manson Properties. In the context of this motion, the Court concludes only that it "conceivably could have personal jurisdiction" over Manson Properties if Plaintiff were to prevail on the alter ego theory. *Pegasus International, Inc., v. Crescent Manufacturing Co.* No. 06-2943, 2007 WL 1030457, *7 (E.D. Pa. April 2, 2007) (quoting *Hershey Pasta Group v. Vitelli-Elvea Co., Inc.*, No. 95-0231, 1995 WL 862016, * 4 (M.D. Pa. June 27, 1995)); *see also Wolfson v. Lewis*, 168 F.R.D. 530, 534 (E.D. Pa. 1996) (holding that the court would not rule on whether the court lacked personal jurisdiction

8

over the additional defendants because there was insufficient evidence and that the issue should be presented in a motion to dismiss); *Impact Labs, Inc. v. X-Rayworld.com, Inc., et al.*, No. 03-211, WL 21715872, *3 (D.Del. July 24, 2003) (granting leave to amend complaint over objection that the court lacked personal jurisdiction); *Mylan Pharmaceuticals, Inc., et al. v. Kremers Urban Development, et al.*, No 02-1628, WL 22711586 (D.Del. Nov. 14, 2003) (same). Therefore, under the liberal analysis in a motion to amend the complaint and considering that neither party provided sufficient evidence to evaluate the issue of personal jurisdiction, the Court finds that the amended complaint is not futile for lack of personal jurisdiction and will address the remaining issues as if the Court has personal jurisdiction over Manson Properties. *Goodman v. The Harry Fox Agency et al.*, No. 03-1176, 2003 WL 25269381, *4 (D.N.J. Dec. 30, 2003) (stating that because there was insufficient information available, the court was not going rule on defendants' motion to dismiss for lack of personal jurisdiction and would assume, without prejudice, that personal jurisdiction was present).

### 2. New Jersey Fraudulent Transfer Act

Defendants next claim that the NJFTA does not apply to Plaintiff's claims because the alleged fraudulent transfer took place in Canada and therefore, as a matter of law, Plaintiff's claims under the NJFTA are futile.

It should be noted that Plaintiff's Proposed Amended Complaint is problematic since it seeks to void the transfer of the property. Even though the NJFTA does not specifically require that the fraudulently transferred property actually be located in New Jersey, it is well established that only courts of the state where the property is located can adjudicate title to property. *Starr v. Berry*, 25 N.J. 573, 589 (1958); *Bullock v. Bullock*, 52 N.J. E.q. 561 (E & A 1894); *Montgomery*

*v. Armstrong*, 128 N.J. E.q. 554 (N.J. Ch. 1941). In addition, in *Clarke v. Clarke*, the United States Supreme Court stated "it is a principle firmly established that to the law of the state in which the land is situated we must look for the rules which govern its descent, alienation, and transfer." 178 U.S. 186, 191 (1990); *Fall v. Eastin*, 215 U.S. 1, 12 (1909) (holding that when the subject matter is specific property, and the relief acts directly upon that property, the proper jurisdiction is the state where the property is located).

The property at issue in the instant motion is located in Canada and because this Court does not have *in rem* jurisdiction over the property it cannot adjudicate Plaintiff's request to void the allegedly fraudulent transfer of the property. To do so would force this Court to render a decree affecting title to real property that is outside of the jurisdiction of this Court and which a Canadian court may decline to enforce.

Plaintiff also argues that the NJFTA is applicable because in addition to seeking to void the transfer of the property, the Plaintiff is also seeking compensatory, consequential, incidental and punitive damages. Therefore, by seeking money damages, the Court does not need to have jurisdiction over the specific property because Plaintiff can still obtain a judgment against Manson Properties by virtue of the court having *in personam* jurisdiction over MEC. [Pl. Reply Br. 11-12]. Thus, title to the property would not be affected and Plaintiff can bring a claim for money damages. [*Id.*].

For support of this assertion, Plaintiff relies upon the New Jersey Supreme Court case of *Starr v. Berry*, 25 N.J. 573 (1958). In *Starr*, an issue in the case was whether the plaintiffs could seek a money judgment against the defendants for a fraudulent transfer of property that was located in another jurisdiction. 25 N.J. at 589. The plaintiffs created a trust in New Jersey that

involved lands in other jurisdictions, including California. *Id*. at 577. The defendant (a New Jersey attorney) created the trust, was counsel to the trustee, and was a part of the fraudulent transfer. *Id*. at 579. The plaintiffs charged the defendant with breaching his fiduciary duties when he negotiated the sale of land in the trust to a corporation that the defendant owed shares of. *Id*. The chancery court had dismissed the complaint based on forum *non conveniens*. *Id*. at 576.

The *Starr* Court, after going through a forum *non conveniens* analysis to determine whether the entire issued should have been litigated in California, was then faced with the argument from the defendant that because the trust relates to land in another jurisdiction the suit should be governed by the law of the state where the land is located. *Id*. at 588. In coming to the conclusion that plaintiffs could seek a money judgment in New Jersey, the court focused on the distinction between claims seeking to disturb property and those strictly for a money judgment. *Id*. at 589. The Court found that the plaintiffs could seek a money judgment against the defendants for the alleged improper transfer of property because they were not seeking to disturb the California property. *Id*. The Court stated:

> plaintiffs do not seek to disturb title to the California realty, or to direct any course of action with respect to a going trust. Rather, they recognize the disposition of the lands to be an accomplished fact, and seek money damages from the alleged malefactors. The broad principle that only local courts shall adjudge title to lands has never been understood to foreclose specific relief elsewhere when the court can enforce its judgment [i]n personam.

*Id*. Based on this holding, Plaintiff argues that "no extra-jurisdictional issues are implicated and Metex is permitted to pursue its claim against Manson Properties under the [NJ]FTA." [Pl. Reply

Br. 12]. Defendants do not dispute this holding but argue that Plaintiff's claims are not governed by the NJFTA but instead by Canadian law. [Def. Sur Reply 5].

The specific question of whether a litigant can sue under the NJFTA for money damages relating to a fraudulent transfer of property in another jurisdiction has not been addressed by New Jersey. Before the Court can address that question, the Court must first address the general question of whether New Jersey would apply its law or the law of the jurisdiction where the property was located in determining whether property was fraudulently transferred.

Other jurisdictions apply the general rule that the law of the situs of the land governs whether or not the property was fraudulently transferred. *See Citizens Bank of Clearwater v. Hunt*, 927 F.2d 707, 710 (D.Conn. 1991) (stating "a fraudulent conveyance claim is governed by the law of the state in which the property is located"); *Colby v. Mclendon*, 116 S.W.2d 505, 510 (Tex. Civ. App. 1938) (applying Oklahoma law to determine whether property was fraudulently conveyed); *In re Sevko, Inc.*, 143 B.R. 167, 174 at n. 4 (Bankr. N.D.Ill. 1992) (stating "the general tendency in deciding fraudulent conveyance claims is to apply the law of the situs of the property at the time of the transfer"); *Allied Products Corp. v. Trinidad Petroleum Corp*. 570 F.Supp. 1353, 1355 (D.Al. 1983) (stating "[u]nder current Alabama law, an action by a creditor to set aside an alleged fraudulent conveyance of land located in another state is local and Alabama state courts have no jurisdiction to hear such actions"); *In re International Loan Network, Inc*., 160 B.R. 1, 18 (Bankr. D.Col. 1993) (stating that the rule that the law of the situs of the property governs to determine the applicable state fraudulent conveyance statutes makes "sense" when real property is involved); *Sylvester v. Sylvester* 723 P.2d 1253, 1257 (Ak. 1986) (stating that "the law of the situs of real property governs the determination of a fraudulent

12

conveyance"); *Bombardier Capital, Inc. v. Richfield Housing Center, Inc.* Nos. 91-CV-750, 91-CV-502, 1994 WL 118294, *4 (N.D.N.Y. March 21, 1994) (stating "the court must also apply New York law to address plaintiff's fraudulent conveyance claims, because under New York law the location of the property dictates what substantive law will govern suits concerning its conveyance"); *In Re Morse Tool, Inc.*, 108 B.R. 384, 387 (Bankr. D.Mass. 1989) (looking to various authorities and stating the general proposition that the law of the situs governs whether a transfer was fraudulent). In addition, when the United States brings an action against an individual for fraudulently transferring property prior to the filing of federal tax liens, the applicable fraudulent transfer laws are that of the state where the property is located. *U.S. v. Westley*, 7 Fed.Appx. 393, 400, 2001 WL 302068, *6 (6th Cir. 2001); *U.S. v. Glascock* 631 F.Supp. 383 (N.D.Al. 1986).

Also instructive on this issue is the case of *James v. Powell*, 19 N.Y.2d 249 (1967). There, the New York Court of Appeals was faced with a similar situation in which the defendant had transferred property in Puerto Rico to a family member to defeat a judgment. *Id*. at 254. Prior to this transfer, the plaintiff in a previous action had succeeded in obtaining a money judgment against the Defendant. *Id*. A few days after the judgment, the defendant's wife "acting in her own capacity" transferred to her relatives real estate that the defendants owned in Puerto Rico. *Id*. Some time later, the plaintiff became aware of the transfer and sued the defendants and the relatives in New York. *Id*. The plaintiff claimed that the transfer was made fraudulently with the intent to prevent the plaintiff from collecting on the judgment. *Id.* at 255.

The Court of Appeals noticed that the parties and the lower courts assumed that New

York substantive law applied to the transfer. *Id*. at 256. In rejecting this approach, the court stated that the parties (and lower courts) overlooked the applicable choice of law principles. *Id.* Further, the court found that "[t]he rule is that the validity of a conveyance of a property interest is governed by the law of the place where the property is located." *Id*. Upholding this conclusion, the court focused on the fact that Puerto Rico was the jurisdiction with the authority to deal with the *res*. *Id*. at 257. Further, the court stated:

> It would be unrealistic to give plaintiff a cause of action for fraud against his debtor and others on the basis of having made a conveyance of property in Puerto Rico if what they did was perfectly valid under the law of that jurisdiction.

*Id*. at 258. Thus, the court held that whether or not the plaintiff was defrauded by the conveyance cannot be determined under New York law and should be decided under Puerto Rico law. *Id.* This Court, therefore, proceeds to a relevant choice of law analysis.February 15, 2008

A federal district court sitting in diversity must apply the choice of law principles of the forum state. *Woessner v. Air Liquide Inc.*, 242 F.3d 469, 472 (3d Cir. 2001) (citing *Klaxon Co. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941)). New Jersey has rejected the rule that the law of the place where the wrong occurred governs, also knows as *lex loci delicti*, in favor of the more flexible governmental interest analysis in choice of law decisions. *Veazey v. Doremus*, 103 N.J. 244, 247 (1986). Under this analysis "the determinative law is that of the state with the greatest interest in governing the particular issue." *Id*. at 248. The first step in the analysis is to determine "whether a conflict exists between the law of the interested states. Any such conflict is to be determined on an issue-by-issue basis" and "[i]f an actual conflict exists, the next step is

to identify the governmental policies underlying the law of each state and how those policies are affected by each state's contacts to the litigation and to the parties." *Id*. Lastly, analysis of a choice of law issue turns heavily on the specific facts of the case. *Fu v. Fu*, 160 N.J. 108, 138-39 (1999). The Court will begin by looking at the relevant statutes to see if an actual controversy exists.

Under the NJFTA:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>> a. With actual intent to hinder, delay, or defraud any creditor of the debtor; or
>> b. Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

N.J.S.A. 25:2-25. In addition, the NJFTA permits several forms of relief. The creditor[1] can seek to void the transfer of the property, N.J.S.A. 25:2-29(a)(1), or seek a judgment for the value of the asset transferred or the amount necessary to satisfy the creditor's claim against the first transferee. N.J.S.A. 25:2-30(b)(1).

The Ontario Fraudulent Conveyance Act ("OFCA") states:

---

[1] The NJFTA defines "creditor" as a person who has a claim and a claim is "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." N.J.S.A. 25:2-21. Thus, the defendant does not have to be a debtor in order for a present or future creditor to assert a cause of action under the NJFTA. *Intilli v. DiGiorgio*, 300 N.J.Super. 652, 659 (N.J.Super. 1997).

> Every conveyance of real property or personal property and every bond, suit, judgment and execution heretofore or hereafter made with intent to defeat, hinder, delay or defraud creditors or others of their just and lawful actions, suits, debts, accounts, damages, penalties or forfeitures are void as against such persons and their assigns.

R.S.O. 1990, c. F. 29 s. 2.  At first glance it appears that the statutes are strikingly similar. However, looking at the rest of the provisions in the statute it is unclear as to whether the OFCA allows an individual to seek money damages.  Moreover, the parties have not presented any case law advocating either position.  The only provision in the statute addressing relief is Section 5 which states:

> Every conveyance of real property heretofore or hereafter made with intent to defraud and deceive the purchaser shall be deemed to be void only as against that person and the person's assigns and all persons lawfully claiming under that person or the person's assigns who have purchased or hereafter purchase for money or other good consideration the same real property or a part thereof.

R.S.O. 1990, c. F. 29 s. 5.  In addition, the Ontario Court of Appeals in *Perry, Farley & Onyschuk v. Outerbridge Mgt. Ltd.*, 199 D.L.R. (4th) 279, ¶ 30 (Ont. C.A.) stated that "[a]ny entitlement to the payment of money or damages in [sic] favour of plaintiff exists independently and apart from the action to set aside the fraudulent conveyance.  The Act gives no right of damages nor compensation for loss. It provides for a declaratory type proceeding that has the effect of nullifying transfers and conveyances of the debtor's property so as to make possible execution of the creditor's debt."  Thus, the Court concludes that a creditor can only seek to void the transfer under the OFCA.  This Court must find, therefore, that a conflict exists between the two statutes because the OFCA's only relief is to void the fraudulent transaction, while the

NJFTA permits a litigant to seek money damages. Because there is a conflict, the Court will now proceed to the next step of the analysis.

The second step in the governmental analysis test is to identify the governmental policies underlying the law of each state and how those policies are affected by each state's contacts to the litigation and to the parties. *Veazey*, 103 N.J. at 248. The purpose of the NJFTA "is to prevent a debtor from placing his or her property beyond a creditor's reach." *Gilchinsky v. National Westminster Bank of N.J.*, 159 N.J. 463, 475 (1999). A debtor cannot "deliberately cheat a creditor by removing his property from the 'jaws of execution.'" *Id*. (citing *Klein v. Rossi*, 251 F.Supp. 1, 2 (E.D.N.Y. 1966)). Thus, claims under the NJFTA allow the creditor to set aside the fraudulent transaction and bring the property "within the ambit of collection." *Id.* Similarly, the purpose underlying the OFCA is to:

> strike down all conveyances of property made with the intention of delaying, hindering or defrauding creditors and others except for conveyances made for good consideration and bona fide to persons not having notice of such fraud.

*Canadian Imperial Bank of Commerce v. Graat*, 1992 5 B.L.R. 2d 271 (Ont.). Clearly both statutes have the same underlying purpose of disallowing improper conveyances of property.

Moving to an examination of the contacts of the parties to New Jersey and Canada, New Jersey's only relevant contacts are that it is the forum of the litigation and the Plaintiff has its primary place of business in New Jersey. [Proposed Am. Comp. ¶ 1]. Canada on the other hand has far more significant contacts: the MEC and Manson Properties are Canadian corporations, the property is located in Canada, Alicia Manson is the owner of Manson Properties and Ian Manson is a Canadian citizen. [Proposed Am. Comp. ¶¶ 2-4]. Since the property is located in

17

Canada, Canada has the stronger interest in making sure that property located in its jurisdiction was not fraudulently transferred. Also to be considered is that this transaction may not even be fraudulent under Canadian jurisprudence and it would be a circumvention of justice to deem the transaction fraudulent under New Jersey law where it could conceivably be lawful in the jurisdiction where the transaction took place. Further, it is not even clear that the property was transferred to defeat a possible judgment by Metex. If anything, Redem would have a stronger claim against Manson Properties and Defendants than Metex. The Court finds that New Jersey has little comparative interest in determining whether this property was fraudulently transferred as the property is not directly related to the instant litigation; this Court, therefore, would apply Canadian law.[2] *Fu v. Fu*, 160 N.J. at 139 (stating "'a foreign state has a real interest in having its law apply to rights and liabilities of parties to an event which occurred within its borders, this Court has recognized that sound principles of comity often require the application of the foreign state's law to a suit brought in the courts of this State.'") (quoting *Melk v. Sarahson*, 49 N.J. 226, 229 (1967); *Mastondrea v. Occidental Hotels Management S.A.*, 391 N.J.Super. 261 (App.Div. 2007) (applying Mexican law over New Jersey law).

The Court also does not believe that the holding in *Starr v. Berry* would alter a New Jersey court's decision. In *Starr v. Berry*, there were many factors and contacts that suggested

---

[2] The Court does not wish to leave Metex hanging "high and dry." If MEC truly transferred the property to Manson Properties in an effort to avoid using the property to satisfy a judgment in favor of Metex, then Metex has a proper forum to seek set aside the property. That forum is the appropriate court in Canada. As discussed, Metex could bring a claim against MEC and Manson Properties under the OFCA to set aside the transfer of the property. Even further, if Metex obtains a judgement against the Defendants, Metex can attempt to enforce that judgment in Canada and set aside the transfer to satisfy the judgment. Denying Metex the opportunity to litigate this matter in New Jersey does not extinguish Metex's only remedy.

that New Jersey was the correct forum and that the Plaintiffs could seek their relief in New Jersey, including: the trust agreement was executed in New Jersey, the parties contractually selected New Jersey as the forum for enforcing the agreement, a New Jersey trustee was appointed, the negotiations of the sale of the property took place in New Jersey and the deed was executed in New Jersey. 25 N.J. at 582-583. These facts demonstrate that New Jersey had strong contacts to the property and all the parties in the action. Even though the *Starr* Court permitted the plaintiffs to seek money damages for the alleged fraudulent transfer of property in California, this Court predicts that New Jersey would follow her sister states and find that a fraudulent transfer of property in another jurisdiction should be governed by the laws of the state where the property is located even if the plaintiff is only seeking money damages. The Court comes to this conclusion because plaintiff should not be permitted to bring a cause of action under New Jersey law for a transaction that was consummated in another state. That should be decided under the law where the transaction occurred.

      Accordingly, this Court finds that the Plaintiff's motion to amended the complaint is futile because a New Jersey Court would not apply NJFTA to a transaction of property in another jurisdiction and because the Plaintiff does not assert its claims under the OFCA. Leave to amend should accordingly be denied. Additionally, the Court declines to address the parties arguments as to whether Defendants actually committed fraud in the transfer of property because this Court finds the amended complaint is futile for the aforementioned reasons.

      Thus, having considered this matter pursuant to Fed. R. Civ. P. 78, and for good cause shown,

**IT IS** on this 15th day of February, 2008,

**ORDERED** that Plaintiff's motion to amend the complaint is **DENIED**;

**AND IT IS FURTHER ORDERED** that the Clerk of the Court is to terminate Docket Entry # 38.

s/ Esther Salas
**ESTHER SALAS**
**UNITED STATES MAGISTRATE JUDGE**
