**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____

METEX MANUFACTURING                )
CORPORATION,                       )
                                   )          Hon. Harold A. Ackerman
              Plaintiff,           )
                                   )          Civ. No. 05-2948 (HAA)
                                   )
       -v-                         )          **OPINION & ORDER**
                                   )
IAN MANSON AND MANSON              )
ENVIRONMENTAL CORPORATION,         )
                                   )
              Defendants.          )
_____)

Jamie P. Clare, Esq.
COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602
*Attorneys for Plaintiff*

Adam K. Derman, Esq.
Laurie J. Sands, Esq.
WOLFF & SAMSON P.C.
One Boland Drive
West Orange, New Jersey 07052
*Attorneys for Defendants*


**ACKERMAN, Senior District Judge:**

       This matter comes before the Court on a motion (Doc. No. 40) by Plaintiff Metex

Manufacturing Corporation ("Metex") for partial summary judgment as to its breach of contract

claim (Count II), and a motion (Doc. No. 42) by Defendants Ian Manson and Manson

Environmental Corporation ("MEC") for partial summary judgment as to Metex's fraudulent

inducement and breach of the covenant of good faith and fair dealing claims (Counts I & III).

For the following reasons, both motions will be denied.

### BACKGROUND

Metex, a New York corporation headquartered in New Jersey, is suing MEC, a Canadian

company, and Manson, MEC's president, sole shareholder and principal operating officer, for

fraudulent inducement, breach of contract, breach of the covenant of good faith and fair dealing,

and replevin.[1]

Metex manufactures knitted wire mesh "substrates" that are used to create small engine

catalysts.  Through a manufacturing process, these substrates can be coated with precious metals

to create catalysts functional in engine mufflers.  MEC coats wire mesh substrates.  In October

2002, Manson met with Metex representatives to discuss a general agreement to jointly obtain

large coating contracts and mass-produce coated small engine parts on a long-term basis.

In June 2004, according to Metex, it obtained a contract with Engineered Exhaust

Systems/B-T, Inc. ("EES"), as a result of Manson's active solicitation of EES's business.  The

contract between Metex and EES called for Metex to deliver to EES 1 million coated catalysts,

with MEC serving as the coater.  To assure that MEC's coating met industry standards, different

tests of various rigor may be performed.  One test, among the most stringent, is known as Atomic

Absorption analysis (the "AA test").  Metex alleges that, prior to entering into the agreement

with MEC to coat 1 million catalysts for EES, Manson represented in a flow chart presentation

that MEC was capable of, and would perform, the AA test to assure that its coating met Metex's

---

[1] In its August 8, 2006 Opinion, this Court denied Defendants' motion to dismiss for lack
of personal jurisdiction.

specifications.  Manson also testified at his deposition that MEC successfully performed AA tests on sample coatings sent to Metex before entering into their agreement.  Metex contends that MEC induced Metex's agreement by representing that it would perform the AA tests on the coating process in execution of their agreement.  Defendants object that, while they did perform the AA tests on samples, such tests were never a basis of their bargain to coat 1 million catalysts.

The agreement between Metex and MEC was governed by a series of purchase orders first arranged in the late summer of 2004.  In these purchase orders, the parties agreed that "[Metex] shall have all rights and remedies afforded by the [UCC] in effect in the [State of New Jersey]."  (Compl. Ex. B.)  In addition, these purchase orders contained a liability and indemnification clause, including the shifting of attorneys' fees in the event of injuries sustained by Metex or its clients resulting from MEC's breach of contract.  These purchase orders, which the parties agree constitute contracts, were drafted by Metex.

Beginning in December 2004, MEC began shipping coated catalysts to Metex pursuant to the aforementioned purchase orders.  Over the next 3 months, MEC shipped more than 575,000 coated catalysts to Metex.  As per the contract, Manson personally verified that the parts MEC produced and shipped to Metex met Metex's and EES's specifications through Quality Assurance Test Reports sent to Metex on a regular basis.  In these Reports, Manson stated that "the product being shipped to Metex met the specification of the purchase order and was equal to the specification of the quotation."  (Clare Decl., Ex. J, 52:6-9.)

In late December 2004, Metex first developed "suspicions" that MEC's production was not meeting Metex's requirements after Metex received warning from consultants that the catalysts' coating was flawed.  (Metex's Reply Br. at 7.)  In February 2005, this suspicion was

3

confirmed by independent laboratory testing, which found that MEC's coating of the wire mesh substrates was not to specification.  Metex notified MEC, Manson, and EES immediately, and demanded corrective action from MEC.  Representatives of Metex traveled to MEC's facility in Canada and met with Manson on various occasions in attempts to help Manson uncover the problem and create a solution.  During this time, EES demanded that corrective action be taken to avoid the close of its manufacturing plant in China and a customer's facility in Arkansas.  EES informed Metex that the coated catalysts failed engine performance tests.  Additionally, four independent laboratories employed by Metex reported test results showing that MEC's coating failed to meet EES or Metex specifications.

Manson was unable to explain the discrepancy between his own tests for specification and the independent laboratory tests.  However, Manson admitted that the parts shipped were not coated to specification as a result of improper testing, and that MEC was unable to coat them correctly.  Specifically, on March 21, 2005, MEC issued a 7-step Corrective Action Plan ("Corrective Action Plan"), which was signed by Manson and sent to Metex.  The Corrective Action Plan admits that "[a]nalyses of parts from the first three production lots were found to contain insufficient quantities of Platinum Group Metals (PGM) Platinum, Palladium and Rhodium," and that "MEC deviated from the analytical process for the sake of expediency. Rather than use the Atomic Absorption equipment which was not correctly operational, a combination of absolute weight gain and x-ray analysis using scanning electron microscope was implemented."  (Clare Decl. Ex. I.)  Despite issuing the Corrective Action Plan, MEC halted further coating of catalysts and demanded payment for all of the catalysts that it coated and recoated upon return, notwithstanding whether the catalysts met Metex's specifications.

4

On June 8, 2005, Metex filed suit against Manson and MEC, alleging that Manson lied about his and MEC's abilities as a coater and fraudulently induced Metex to enter into a contract with MEC, and that MEC breached their contract.  Metex claims that Manson personally assured Metex that he and MEC were capable of producing parts to specification and in satisfaction of AA tests, when in fact, they did not have the intention, ability or resources to do so.

As a result of Defendants' alleged misrepresentations and breach of contract, Metex claims that it incurred $347,527 in losses for nonconforming goods, $48,937.75 in consulting fees, $38,817.71 in travel expenses, $31,231.50 for laboratory testing, and legal expenses currently exceeding $180,000.  Moreover, Metex contends it sustained lost profits of $400,156 from its base contract with EES and $3,017,000 in losses for future, anticipated business with EES, which decided to contract with an alternate vendor of coated catalysts.  In addition, Metex seeks indemnification for $169,085 for its settlement with EES and $292,177 for its obligation to provide credit on future orders with EES.  All told, Metex seeks approximately $4,524,931 in damages.

### ANALYSIS

### I.        Standard of Review

Pursuant to Federal Rule of Civil Procedure 56(c), a motion for summary judgment will be granted:

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c); *see also Todaro v. Bowman*, 872 F.2d 43, 46 (3d Cir. 1989); *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 896 (3d Cir. 1987).  In other words, "summary judgment may be granted if the movant shows that there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." *Miller v. Indian Hosp.*, 843 F.2d 139, 143 (3d Cir. 1988).  All facts and inferences are construed in the light most favorable to the non-moving party.  *See Peters v. Delaware River Port Auth. of Pa. and N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994).

The substantive law will identify which facts are "material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Therefore, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.  An issue is "genuine" if a reasonable jury could possibly hold in the nonmovant's favor with regard to that issue. *Id.*  At the summary judgment stage, a court may not weigh the evidence or make credibility determinations; these tasks are left to the finder of fact.  *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1230 (3d Cir. 1993).  Therefore, to raise a genuine issue of material fact, the summary judgment opponent "'need not match, item for item, each piece of evidence proffered by the movant,' but simply must exceed the 'mere scintilla' standard." *Id.*  (citing *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)).  Once the moving party has carried its burden of establishing the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and

on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); see also *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir.1991) (stating that non-movant may not "rest upon mere allegations, general denials, or . . . vague statements"). Thus, if the non-movant's evidence is merely "colorable" or is "not significantly probative," the court may grant summary judgment. *Anderson*, 477 U.S. at 249-50.

The Court will first address Defendants' motion for partial summary judgment as to Metex's claims for fraudulent inducement (Count I) and breach of the covenant of good faith and fair dealing (Count III). The Court will then discuss Metex's motion for partial summary judgment as to its breach of contract claim (Count II). Sitting in diversity, and enforcing the parties' choice of law provision, this Court is reposed with responsibility for determining the scope of liability under New Jersey law, and where applicable, the New Jersey-adopted provisions of the UCC. (*See* Compl., Ex. B.)

## II.    Defendants Are Not Entitled to Summary Judgment as to Metex's Claims For Fraudulent Inducement (Count I) and Breach of the Covenant of Good Faith and Fair Dealing (Count III).

### A.    There is a Genuine Dispute Regarding Whether Defendants Fraudulently Induced Metex to Enter Into the Agreement.

Defendants move for summary judgment as to Metex's fraudulent inducement claim. At the outset, the Court notes that Metex may pursue its fraud claim concurrent with its contract claim. Defendants argue that the economic loss doctrine prevents Metex from pursuing both claims. That doctrine "prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract." *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 618 (3d Cir. 1995). Courts have "construed the law of New Jersey to prohibit fraud

claims when the 'fraud contemplated by the plaintiff . . . does not seem to be extraneous to the contract, but rather on fraudulent performance of the contract itself." *Unifoil Corp. v. Cheque Printers & Encoders Ltd.*, 622 F. Supp. 268, 271 (D.N.J. 1985) (quoting *Foodtown v. Sigma Mktg. Sys., Inc.*, 518 F. Supp. 485, 490 (D.N.J. 1980)).  However, New Jersey law permits a tort claim to proceed with a breach of contract claim when the tort claim involves fraudulent inducement on the theory that such a claim is extraneous to the performance of the related contract.  *Florian Greenhouse v. Cardinal IG Corp.*, 11 F. Supp. 2d 521, 528 (D.N.J. 1998); *see also Bracco Diagnostics, Inc. v. Bergen Brunswig Drug Co.*, 226 F. Supp. 2d 557, 562 (D.N.J. 2002).

Defendants invite this Court to rule that Metex's fraud claim involves an alleged fraud or breach that occurred only in the performance of the contract, and not in the inducement of the contract.  The Court declines the invitation.  Metex expressly pleads fraud in the inducement, and the Court finds below that there is a genuine dispute as to whether Defendants fraudulently induced Metex to enter into the parties' contract.  The Court thus turns to the merits of Metex's claim.

To sustain a claim for fraud in the inducement, Metex must show that Defendants perpetrated "[1] a material representation of a presently existing or past fact, [2] made with knowledge of its falsity and [3] with the intention that the other party rely thereon, [4] resulting in reliance by that party [5] to his detriment."  *Jewish Ctr. of Sussex Cty. v. Whale,* 86 N.J. 619, 624 (1981).  "Statements as to future or contingent events, to expectations or probabilities, or as to what will or will not be done in the future, do not constitute misrepresentations, even though they may turn out to be wrong."  *Alexander v. CIGNA Corp.*, 991 F. Supp. 427, 435 (D.N.J.

8

1998).   Where entrance into a contract has been fraudulently induced, "a knowing misstatement

has been made, on the basis of which the defrauded party signs the instrument." *Deerhurst*

*Estates v. Meadow Homes, Inc.*, 64 N.J. Super. 134, 144 (App. Div. 1961).

Here, Metex offers support for its argument that Defendants misrepresented to Metex that

it could coat Metex's substrates in conformity with AA testing standards, on the basis of which

Metex entered into its agreement with Defendants.  For instance, Manson testified at his

deposition that MEC employed AA testing on Metex's samples in the summer of 2004 that "met

approval" for AA testing standards.  (Clare Decl., Ex. J, at 43:12-13.)  These samples were then

sent to Metex prior to the parties entering into the contract to demonstrate MEC's capabilities

ahead of their potential agreement with Metex.  (*Id.* at 42:24-43:17.)  Defendants further

represented to Metex, in a flow chart presentation made prior to entering into the agreement with

Metex, that Defendants could "[a]nalyze solution and washings using AA equipment."  (Messina

Decl., Ex. A.)  However, following the return of laboratory tests in February 2005 confirming

Defendants' defective coating, Manson acknowledged the next month that "[r]ather than use the

Atomic Absorption [AA] equipment which was *not correctly operational*, a combination of

[other tests were] implemented . . . for the sake of expediency."  (Clare Decl. Ex. I.(emphasis

added).)  This evidence indicates a genuine dispute whether Defendants misrepresented its ability

to properly coat Metex's substrates in the summer of 2004.[2]

_____

[2] Defendants argue that Metex representatives told Defendants to switch to a different
testing method in November 2004, just prior to the first shipment of the coated goods.  However,
even if this allegation was true, an inference the Court need not draw at this stage in favor of
Defendants as the moving parties, this alleged representation occurred after the parties entered
into their agreement and thus is irrelevant to whether Defendants made misrepresentations to
induce Metex's agreement in the summer of 2004.  Defendants also argue that its AA equipment
was in fact functional, but merely not "calibrated" for use.  (Defs.' Reply Br. at 4.)  That
argument – in apparent contradiction to the content of the Corrective Action Plan – only serves to

Based on the same evidence, there is a genuine dispute whether Defendants misrepresented its coating capabilities with knowing falsity and with the intention that Metex rely.  Defendants argue that they did not intend for its AA testing samples to serve as a basis for the bargain, but rather, that the parties intended for an alternative testing process to be utilized.  Yet, Manson acknowledged in his Corrective Action Plan that he was aware of the AA standards and chose to forgo its utilization for expediency's sake.  "Proof of intent is difficult, subjective and always a matter of inference."  *Lilliston Chrysler Plymouth Dodge Truck Jeep Eagle, Inc. v. Universal Underwriters Group*, 329 N.J. Super. 318, 324 (App. Div. 2000).  Thus, "[a] summary judgment motion should not ordinarily be granted when an action or defense requires determination of a state of mind or intent, such as claims of waiver, bad faith, *fraud* or duress." *Id.* (emphasis added); *see also Shebar v. Sanyo Business Systems Corp.*, 111 N.J. 276, 291 (1988).  Accordingly, there is a genuine dispute concerning Defendants' knowing falsity and intention that Metex rely on Defendants' alleged misrepresentation.

There also is a genuine dispute whether Metex reasonably relied upon and suffered damages stemming from Defendants' alleged misrepresentation.  Manson testified that MEC prepared samples that met AA testing standards and sent these samples to Metex prior to the parties entering into their contract.  If true, Metex may have reasonably relied on these compliant samples as indicative of MEC's capability to perform its contract with Defendants.  Further, Metex alleges detailed damages arising from this alleged misrepresentation, which will be discussed in detail later in this Opinion, including impaired inventory, lost profits, and other

---

further highlight a dispute of fact appropriate for a jury to resolve.

related consequential and incidental damages.  There are genuine disputes of fact regarding

Metex's fraudulent inducement claim, thus precluding summary judgment on this count.[3]

Defendants argue that even if Metex survives summary judgment on its fraudulent

inducement claim, Metex's claim is nevertheless barred because it forwent its right to pursue its

fraud claim by virtue of continuing to perform its contract with EES and Defendants after it

learned of Defendants' alleged breach.  Defendants assert that Metex had warning of a potential

problem in December 2004, yet continued to send substrates to EES; and that Metex knew

further about the defective coating by the end of February when the laboratory test results were

confirmed, yet continued to perform under the contract by sending its substrates to Defendants

for coating until May.  Thus, Defendants contend that Metex's conduct in continuing to perform

under the parties' agreement constitutes a waiver of its fraud claim.

"Waiver, under New Jersey law, involves the intentional relinquishment of a known right,

and thus it must be shown that the party charged with the waiver knew of his or her legal rights

and deliberately intended to relinquish them."  *Shebar*, 111 N.J. at 291.  "[U]nless a party

intentionally relinquishes a right with *full knowledge of the facts*, the right persists."  *Gladstone*

*v. Ludsin*, No. C-171-03E, 2006 WL 1642705, at *7 (N.J. App. Div. June 15, 2006) (emphasis

added).  However, "the intention to waive need not be stated expressly but may be spelled out

---

[3] Defendants also argue in their Brief that Metex fails to plead its fraud claim with
sufficient particularity, with special emphasis on the intent elements of fraud.  Federal Rule of
Civil Procedure 9(b) provides: "In all averments of fraud or mistake, the circumstances
constituting fraud or mistake shall be stated with particularity.  Malice, intent, knowledge, and
other condition of mind of a person may be averred generally."  Defendants do not allude to this
argument in their Reply Brief.  Notwithstanding the potential lack of timeliness in raising this
argument at the summary judgment stage, the Court finds that Metex sufficiently pleads intent.
Further, Metex's detailed account of the surrounding circumstances of the alleged fraud satisfies
the particularity requirement of Rule 9(b).

from a state of facts exhibiting *full knowledge of the circumstances* producing a right and

continuing indifference to exercise of that right." *Merchants Indem. Corp. v. Eggleston*, 68 N.J.

Super. 235, 254 (App. Div. 1961), *aff'd*, 37 N.J. 114 (1962) (emphasis added).  This Court

follows the Supreme Court of New Jersey's "admonition that waiver issues, which turn on intent,

should not be decided on a summary judgment basis." *Garden State Bldgs., L.P. v. First Fidelity

Bank, N.A.*, 305 N.J. Super. 510, 527 (App. Div. 1997).

 In suits pursuing fraudulent inducement, if a party continues to perform under a contract

after learning of the fraud, that party is deemed to have waived its right to pursue its fraud claim.

*Gennari v. Weichert Co. Realtors*, 288 N.J. Super. 504, 546 (App. Div. 1996).  "The theory

behind this position is that if the defrauded party chooses to proceed with the contract as it

stands, he has suffered no injury by reason of the fraud." *Deerhurst*, 64 N.J. Super. at 144.

 Here, Metex's continued performance of the parties' agreement after receiving warning

and laboratory confirmation of MEC's defective coating does not, standing alone, act as a waiver

of its fraud claim because there is a dispute of fact as to whether Metex had full knowledge of the

facts underlying the fraud.  After Metex received warning in December 2004 and confirmation in

February 2005 of MEC's defective coating, Manson sent Quality Assurance Test Reports to

Metex for MEC's continued coating through May 2005 confirming, in Manson's own words, that

"the product being shipped to Metex met the specification of the purchase order and was equal to

the specification of the quotation."  (Clare Decl., Ex. J, 52:6-9.)  Further, Metex representatives

traveled in the spring of 2005 to MEC's plant in Canada to help MEC determine and remedy the

problem.  Thus, there is a dispute of fact as to whether Metex's believed that the defective

coating process had been remedied.  More importantly, even if Metex was fully aware that

Defendants' coatings performed after December 2004 or February 2005 were defective, there is a

dispute of fact whether Metex knew that Defendants were perpetrating an alleged *fraud*.

Notably, Manson wrote to Metex in his Corrective Action Plan that the "[p]otential root causes

[of the defects] are still being investigated."  (Clare Decl. Ex. I.)  Thus, there is a dispute of fact

as to whether Metex knew that the cause of the defective coating was attributable to an alleged

fraud.  Accordingly, based on Manson's Quality Assurance Test Reports, Corrective Action Plan,

and other communications to Metex, there is a dispute of fact as to whether Metex had full

knowledge of the alleged fraud such that Metex's continued performance of the contract

constituted a known waiver of its fraud claim.  Following New Jersey law, this Court must

reserve the issue of waiver here for the finder of fact.  Defendants' motion for summary judgment

as to Metex's fraudulent inducement claim will be denied.


### III.    Defendants Are Not Entitled to Summary Judgment as to Metex's Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing.

In Count III of its Complaint, Metex alleges that Defendants breached its implied

covenant of good faith and fair dealing.  A covenant of good faith and fair dealing is implied in

every contract in New Jersey.  *Sons of Thunder, Inc. v. Borden, Inc.*, 148 N.J. 396, 420 (1997) .

For contracts invoking the UCC, New Jersey law has defined good faith as "honesty in fact and

the observance of reasonable commercial standards of fair dealing in the trade."  N.J. Stat. Ann. §

12A:2-103(1)(b).  A party breaches this implied covenant "if the breaching party exercises its

discretionary [contracting] authority arbitrarily, unreasonably, or capriciously, with the objective

of preventing the other party from receiving its reasonably expected fruits under the contract."

*Wilson v. Amerada Hess Corp.*, 168 N.J. 236, 251 (2001).  Put differently, "[a] party to a contract

13

breaches the covenant if it acts in bad faith or engages in some other form of inequitable conduct in the performance of a contractual obligation." *Black Horse Lane Assoc., L.P. v. Dow Chem. Corp.*, 228 F.3d 275, 288 (3d Cir. 2000). Thus, a showing of bad faith by the breaching party is the essential element of this claim. *Wilson*, 168 N.J. at 251; *see also Akshayraj, Inc. v. Getty Petroleum Mktg., Inc.*, No. 06-2002, 2007 WL 708852, at *7 (D.N.J. Mar. 6, 2007).

Here, the Court has already found that Metex presents evidence sufficient to demonstrate a genuine dispute as to Defendants' bad faith intent. Further, given that a finding of bad faith is a determination best left to the jury, see *Lilliston*, 329 N.J. Super. at 324, this Court will deny Defendants' motion for summary judgment as to Metex's claim for breach of the covenant of good faith and fair dealing. The Court now turns to Metex's motion for summary judgment as to its contract claim.

### IV.   Metex is Not Entitled to Summary Judgment as to its Breach of Contract Claim.

In Count II of its Complaint, Metex alleges breach of contract. In order to prove a claim for breach of contract, a party must show "a valid contract, defective performance by the defendant, and resulting damages." *Coyle v. Englander's*, 199 N.J. Super. 212, 223 (App. Div. 1985). "The essentials of a valid contract are: mutual assent, consideration, legality of object, capacity of the parties and formality of memorialization." *Cohn v. Fisher*, 118 N.J. Super. 286, 291 (Law Div. 1972).

Here, it is undisputed that the purchase orders constitute contracts setting out material terms governing the parties' business relationship. Metex ordered and paid for various installments of specified products, which were prepared and shipped by Defendants to Metex.

14

Further, it is undisputed that Defendants' contract performance was defective, as admitted by

Manson in his Corrective Action Plan.  (*See* Clare Decl. Ex. I.)  Thus, the only dispute

concerning Metex's contract claim pertains to damages.  The Court will examine Metex's

allegations of direct, consequential, and incidental damages, specifically, (A) Metex's direct and

consequential damages in the form of its impaired inventory and its dealings with EES; (B)

Metex's attorneys' fees, and (C) Metex's incidental damages in the form of travel and consultant

expenses.

> A.    There is a Genuine Dispute Concerning Metex's Reasonable Efforts to
>       Mitigate its Direct & Consequential Damages, Thus Precluding Summary
>       Judgment on Those Specific Contract Damages.

Under New Jersey law, a buyer-claimant may obtain direct damages for the difference

between the market price and contract price of the goods at the time of the breach, as well as

incidental and consequential damages flowing from such breach.  N.J. Stat. Ann. § 12A:2-711-

714.  Consequential damages are defined as "any loss resulting from general or particular

requirement and needs of which the seller at the time of contracting had reason to know and

which could not be reasonably prevented by cover or otherwise."  N.J. Stat. Ann. § 12A:2-715.

However, under the common law and the UCC, "[i]t is well settled that injured parties have a

duty to take reasonable steps to mitigate their damages."  *C.A.M. v. R.A.W.*, 237 N.J. Super. 532,

543 (App. Div. 1990); *see also McDonald v. Mianecki*, 79 N.J. 275, 299 (1979).  "[T]he burden

of proving facts in mitigation of damages rest[s] upon the party breaching the contract."  *Cohen

v. Radio-Elecs. Officers Union*, 275 N.J. Super. 241, 262 (App. Div.1994).

Metex's alleged direct and consequential damages include its impaired inventory

resulting from MEC's defective performance, expenses arising from its settlement with EES, and

15

lost profits from its dealings with EES.  Similar to its waiver argument, Defendants contend that Metex did not take the requisite steps to mitigate these damages because Metex accepted goods from Defendants and sold such coated goods to EES with the reasonable knowledge that the goods were defective.  (Defs.' Br. at 12, 19.)  Defendants point to evidence obtained in discovery that demonstrates that Metex was warned that Defendants' products were potentially impaired before Metex processed further orders from Defendants and completed its contract with EES.  For example, in a December 21, 2004 letter from a testing laboratory, Metex was informed that "the concentrations [of Defendants' coated catalysts] were not uniform" and that further testing "will aid in establishing the fluctuations in the concentrations of the elements."  (Sands Decl., Ex. B.)  Similar findings were recorded in a January 28, 2005 letter to Metex from another laboratory.  (*Id.*)  These laboratory reports show that Metex may have had knowledge or warning of impaired goods when it proceeded to send more substrates to Defendants and perform its contract with EES, without taking reasonable steps to mitigate its allegedly accruing damages.

Further, Metex acknowledges that it received final laboratory confirmation of the goods' impairment in February 2005, yet one of its employees, Kurry Emmons, testified that Metex continued to send wire mesh substrates to MEC for coating until May 2005.  (Sands Decl., Ex. G, 108:6-17.)  Emmons testified that Metex continued these efforts because "we were in the middle of a contract and we owed parts to our customer.  We had not identified another coater to work with yet at that time."  (*Id.* 108:15-17.)  Emmons' testimony shows that, again, Metex may have incurred damages despite its affirmative knowledge that the Defendants were not satisfying their contract.

16

Metex responds that preventing or mitigating its damages "was not a commercially reasonable option" and that it "did not know for a fact that [Defendants'] parts failed to conform to specification." (Metex Reply Br. at 7.) However, whether Metex had knowledge of a fact or "made reasonable efforts to mitigate its damages [i]s a question for the trier of fact." *State v. Ernst & Young, L.L.P.*, 386 N.J. Super. 600, 616 (App. Div. 2006); *see also Tobia v. Cooper Hosp. Univ. Med. Ctr.*, 136 N.J. 335, 343 (1994); *Borough of Fort Lee v. Banque National de Paris*, 311 N.J. Super. 280, 292 (App. Div. 1998). Thus, there is a genuine dispute as to whether Metex made reasonable efforts to prevent or mitigate its damages pertaining to its impaired inventory and dealings with EES. Accordingly, Metex's motion for summary judgment as to its contract claim, insofar as it relates to its direct and consequential damages, i.e., impaired inventory and dealings with EES, will be denied. The Court need not reach Metex's argument in support of its damages of future lost profits because it already finds that there is a genuine dispute as to whether Metex could have prevented or mitigated its consequential damages, which includes future lost profits.

> B.  While Metex May Recover Attorneys' Fees, There is a Genuine Dispute as to the Amount of Such Award.

Relying on the terms of the parties' contract, Metex seeks reimbursement for attorneys' fees thus far incurred in its dispute with EES and Defendants. While the Court recognizes that New Jersey law has a strong policy disfavoring the shifting of attorneys' fees, it is well settled that courts will enforce contractual fee-shifting provisions. *Cmty. Realty Mgmt., Inc. v. Harris*, 155 N.J. 212, 234 (1998). However, attorneys' fees "are not recoverable absent express authorization by . . . contract." *State, Dept. of Envtl. Prot. v. Ventron Corp.*, 94 N.J. 473, 505 (1983) (emphasis added). If a fee-shifting provision is vague, the Court resorts to the American

17

Rule that attorneys' fees are not recoverable.  *Van Horn v. City of Trenton*, 80 N.J. 528, 538

(1979).  Because of the general policy disfavoring fee-shifting arrangements, contractual

provisions establishing such arrangements are "strictly construed."  *McGuire v. City of Jersey

City*, 125 N.J. 310, 326-27 (1991); *see also Leitao v. Damon G. Douglas Co.*, 301 N.J. Super.

187, 191 (App. Div. 1997) ("[A]mbiguous indemnification clauses should be strictly construed

against the indemnitee.").

> "The existence or absence of ambiguity is itself a 'threshold' question of law for the court

to decide."  *Heffron v. Adamar of N.J., Inc.*, 270 F. Supp. 2d 562, 570 (D.N.J. 2003) (citing

*Teamsters Indus. Employees Welfare Fund v. Rolls-Royce Motor Cars, Inc.*, 989 F.2d 132, 135 n.

2 (3d Cir.1993)); *see also DiGiorgio Corp. v. Mendez & Co.*, 230 F. Supp. 2d 552, 561 (D.N.J.

2002).  If the provision's language is clear, then a court may decide its import on summary

judgment.  *Kaufman v. Provident Life & Cas. Ins. Co.*, 828 F. Supp. 275, 282 (D.N.J. 1992).

"An ambiguity in a contract exists if the terms of the contract are susceptible to at least two

reasonable alternative interpretations."  *Kaufman*, 828 F. Supp. at 283.

> Here, the fee-shifting provision is clear and unambiguous concerning Metex's recovery of

attorneys' fees as part of a direct action against MEC.  The full provision states:

> > PRODUCT LIABILITY/PATENT PROTECTION:
> > **[1]** . . .
> > **[2]** *[MEC] agrees to <u>indemnify</u> [Metex] and its customers for and
> > hold each of them harmless from <u>any</u> liability, loss, cost and expense
> > (<u>including reasonable attorneys' fees</u>) which [Metex] and its
> > customers or either of them may directly or indirectly incur <u>arising
> > from any</u> alleged breach of [MEC's] warranties and/or obligations
> > hereunder.*
> > **[3]** [MEC] hereby acknowledges that [Metex] shall incur incidental
> > and consequential damages, including but not limited to a loss of
> > profits, arising from any breach of [MEC's] warranties and

18

> obligations hereunder, and [MEC] agrees to reimburse [Metex] for
> any such incidental or consequential damages.

(Compl., Ex. B (emphasis added).)  The issue is whether the parties intended the word "indemnify" to include recovery for Metex's direct claims against MEC.  Metex relies on the broad language of the second sentence to argue that the contract permits Metex to recover "any" loss, including attorneys' fees in a direct action against MEC.  (Compl., Ex. B.)  Defendants respond that Metex's interpretation is "tortured" because the phrase "indemnify" merely permits Metex's recovery for losses incurred from third-party actions against Metex, not for Metex's direct action against Defendants.  The Court is not persuaded.  As Metex suggests, it is Defendants' interpretation that is tortured.

Examining the plain language of the provision, the contract is clear and unambiguous in providing for Metex's attorneys' fees for "*any* liability . . . arising from *any* alleged breach of [MEC's] warranties and/or obligations[.]" (Compl., Ex. B (emphases added).)  The provision does not distinguish between direct and third-party losses.  If the Court was to adopt MEC's interpretation, then examining the provision as a whole, *see Knauss v. Dwek*, 289 F. Supp. 2d 546, 552 n.3 (D.N.J. 2003), the third clause would be an enigma.  MEC's reading would compel the nonsensical conclusion that Metex may obtain consequential and incidental damages stemming from its direct suit against MEC, but could not obtain the direct damages from which its consequential and incidental damages would flow.  Defendants' recommendation cannot withstand common sense.

Neither party cites relevant New Jersey caselaw for support.  Nevertheless, this Court observes that another case in this Circuit has spoken to the circumstance presented here.  In *STS Holdings, Inc. v. CDI Corp.*, the Eastern District of Pennsylvania examined an indemnification

19

provision that stated: "The Seller agrees to indemnify and hold harmless the Buyer . . . from and against []any loss, liability, claim, obligation, damage or deficiency arising out of or resulting from []any misrepresentation or breach of warranty[.]"  No. 99-3480, 2004 WL 739869, at *1 (E.D. Pa. Mar. 19, 2004).  There, the plaintiff argued that the term "indemnify" was "limited to claims brought by third parties."  *Id.* at *2.  However, the court found that "[w]hile third party claims are indeed among those subject to indemnification . . ., they are not the only claims identified.  Claims between the parties themselves are certainly covered by the plain language[.]"  *Id.*  Thus, the court held that the indemnification clause applied to the plaintiff's direct action against the defendant.

Courts in other jurisdictions have also held that the term "indemnify" includes losses irrespective of "whether the loss is caused by a party to the agreement or by a third party."  *Id.*; *see also, e.g.*, *Yang Ming Marine Trans. Corp. v. Okamoto Freighters Ltd.*, 259 F.3d 1086, 1092 (9th Cir. 2001) ("[A]n indemnitor's obligation to indemnify an indemnitee extends beyond the mere reimbursement of third party claims."); *Litton Microwave Cooking Prod. v. Leviton Mfg. Co.*, 15 F.3d 790, 796 (8th Cir. 1994) ("Only a strained reading could produce [a] third-party suit requirement . . . on the indemnity clause."); *Atari Corp. v. Ernst & Whinney*, 981 F.2d 1025, 1031-32 (9th Cir. 1992) ("The district court was wrong to assume that the word 'indemnify' necessarily carries with it the baggage of the clauses in which it most frequently appears.").

Black's Law Dictionary similarly defines "indemnify" broadly: "To restore the victim of a loss, in whole or in part, by payment, repair, or replacement."  Another definition states: "To save harmless; to secure against loss or damage; to give security for the reimbursement of a person in case of an anticipated loss falling upon him."  *Black's Law Dictionary* 692 (5th ed.

1979).  These definitions accord with the weight of caselaw favoring an expansive interpretation of "indemnify."

The above-cited authorities are instructive for the instant matter.  Scrutinizing the plain meaning of the clause, the Court finds that the broad language employed indicates an express provision for attorneys' fees incurred in the pursuit of direct claims against Defendants.  "If the parties wanted to limit indemnification to third party claims only, it was incumbent upon them to include such a provision[,]" yet no limitation to third-party claims was stated.  *STS Holdings*, 2004 WL 739869, at *3; *see also Battelle Mem. Inst. v. Nowsco Pipeline Services, Inc.*, 56 F. Supp. 2d 944, 951 (S.D. Ohio 1999) ("[A] party wishing to narrow an indemnification clause to third-party damage is obligated to limit the scope of the clause expressly; and absent such express limitation, indemnification clauses may apply to damage suffered by the contracting parties themselves.").

Defendants contend that this Court should follow an unpublished decision from the Tenth Circuit, *Metroplex Corp. v. Thompson Industries, Inc.*, which limited the application of an indemnification clause to third-party actions.  25 F. App'x. 802 (10th Cir. 2002).  However, that case is readily distinguishable because that court examined an indemnification clause that made explicit reference to "third-party" claims.  *Id.* at 807 ("[T]he second sentence clearly contemplates indemnification for third-party claims – as indicated by the express reference to a lawsuit 'brought by a third-party.'").  This Court finds that the indemnification provision at issue here is clear and unambiguous as a matter of law, and thus permits Metex the right to recover its attorneys' fees arising from Defendants' alleged breach.

Addressing the precise figure Metex is owed for its attorneys' fees, this Court nevertheless "cannot grant [Metex] the award it seeks on summary judgment based on the evidence before the Court." *King v. GNC Franchising, Inc.*, No. 04-5125, 2007 WL 1521253, at *4 (D.N.J. May 23, 2007). "The party seeking attorneys' fees has the burden to prove that its request for attorneys' fees is reasonable." *Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3d Cir. 1990). To meet its burden, the fee petitioner must "submit evidence supporting the hours worked and rates claimed." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).

Metex has not submitted evidence sufficient to ascertain with reasonable certainty the legal fees it incurred. "[Metex] must prove [its] damages in respect of the obligation for legal expenses in the same manner as they would any other item of damages. There must be plenary proof, not merely by ex parte affidavit, of the actual services necessarily rendered in the prosecution of the action, and of the reasonable value thereof[.]" *Cohen*, 86 N.J. Super. at 217. Metex's bald statement that it is owed $180,000 in legal fees is insufficient, as Metex itself acknowledges in its papers.

"The Court finds that there is a genuine issue of fact as to the amount of [Metex's] recoverable attorneys' fees[.]" *King*, 2007 WL 1521253, at *4. Thus, the Court will deny Metex's motion for summary judgment as to the award of attorneys' fees. With the appropriate proofs, Metex may file with this Court its claim for attorneys' fees "no later than 14 days after entry of judgment[.]" Fed. R. Civ. P. 54(d)(2)(B). Because the Court will deny Metex's motion for partial summary judgment, it is at this time premature for Metex to file such a claim unless or until such a "judgment" is entered. *Id.*

    C.    <u>There is a Genuine Dispute Regarding Metex's Incidental Damages.</u>

22

Metex's remaining alleged damages are incidental, namely, consultant and travel expenses. Because there is a genuine dispute as to the recoverable figure for each of these alleged damages, Metex's motion for summary judgment as to its incidental damages will be denied.

In the parties' contracts, Metex's available damages are defined to include "incidental[] damages . . . arising from any breach of [MEC's] warranties and obligations[.]" (Compl. Ex. B.) Incidental damages are defined under New Jersey law as "expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses, or commissions in connection with effecting cover and any other reasonable expense incident to the delay or breach." N.J. Stat. Ann. § 12A:2-715.

Metex seeks $48,937.75 in consulting fees, $31,231.50 for laboratory testing, and $38,817.71 in travel expenses. Defendants challenge these damages on two grounds. First, Defendants argue that Metex offers inadequate support for these figures because Metex merely offers a summary bill of these damages without the underlying, supporting documentation. However, the Court notes that Metex appears to largely substantiate these figures with documents attached to its motion papers. (Clare Decl., Ex. A.)

Second, Defendants contest the accuracy of Metex's bases for calculating these incidental damages. (*See* Defs.' Br. at 31, 33.) For instance, Defendants argue that some travel expenses were billed "prior to MEC commencing the coating of the substrates at issue in this case and had nothing to do with MEC's alleged breach." (*Id.* at 31.) Defendants point to deposition testimony by Metex employees underscoring these alleged discrepancies. (*See* Sands Decl., Ex. G, 58:25-59:9, 32:14-33:14.) For example, Emmons testified that Metex employees traveled to

Defendants' plant on several occasions before the alleged breach of contract occurred.  (*Id.*)  Yet Metex's travel documentation does not adequately demonstrate how it arrived at its damages figure, such as whether it included trips such as the ones about which Emmons testified.  (*See* Clare Decl., Ex. A.)

Furthermore, it is unclear to what extent Metex's alleged damages incurred for consulting and laboratory testing suffice as purely incidental damages arising from MEC's alleged breach. "Under New Jersey law, once a plaintiff has established an injury, it need prove the amount of damages only to a reasonable degree of certainty."  *Lithuanian Commerce Corp., Ltd. v. Sara Lee Hosiery*, 219 F. Supp. 2d 600, 605 (D.N.J. 2002) (citing *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1176 (3d Cir. 1993)).  New Jersey law also requires, generally, that such charges be "commercially reasonable" in relation to the breach.  N.J. Stat. Ann. § 12A:2-715.

Metex has not proven, as a matter of law, that its alleged incidental damages are reasonably incidental to the underlying dispute.  For instance, one laboratory consulting bill is dated July 14, 2006, (*see* Clare Decl., Ex. A at 14), well over a year after Metex learned that the goods were defective and ceased sending substrates to MEC.  Thus, it is unclear whether these bills are "incident to the delay or breach," N.J. Stat. Ann. § 12A:2-715, or, alternatively, whether these bills arise from litigation or relate to some other commercial venture altogether.

Accordingly, the amount of the award presents a material issue of fact that precludes summary judgment in Metex's favor.[4]  *See Lithuanian Commerce Corp.*, 219 F. Supp. 2d at 606 ("[Defendant's] challenge to this evidence goes to the weight the [plaintiff's documents] are to

---

[4] Furthermore, depending on how the jury resolves whether Metex took reasonable steps to mitigate its damages, Metex's recovery of incidental damages may be altered by the jury to reflect its finding.

24

be given, and, therefore, is clearly an improper basis for granting judgment as a matter of law."). The Court will deny Metex's motion for partial summary judgment as to its breach of contract claim.

## CONCLUSION & ORDER

For the foregoing reasons, Defendants' motion for partial summary (Doc. No. 42) as to Counts I & III of Metex's Complaint is DENIED.  Metex's motion for partial summary judgment (Doc. No. 40) as to Count II of its Complaint is also DENIED.  All four counts of Metex's Complaint remain pending.

Newark, New Jersey
Dated: March 28, 2008

s/ Harold A. Ackerman
U.S.D.J.